**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| CARRA JANE PENEGAR, Executrix of the Estate of JOHNNY RAY PENEGAR, JR., individually and on behalf of others similarly situated, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, VERISK ANALYTICS, INC., and ISO CLAIMS PARTNERS, INC., | ) ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) |

## CLASS ACTION COMPLAINT

The Plaintiff, Carra Jane Penegar, Executrix of the Estate of Johnny Ray Penegar, Jr., suing individually, and on behalf of a putative class of those similarly situated, alleges:

I. **INTRODUCTION**.

1.       The Plaintiff's decedent, her husband Mr. Penegar, was over age 65 and a Medicare beneficiary when he was diagnosed with the asbestos-related cancer, mesothelioma. He received medical care covered by Medicare, which extended his life. He brought a workers' compensation claim against the employer at whose workplace he was exposed to asbestos in the past, alleging that this workplace exposure was a proximate cause of his mesothelioma diagnosis. He also named in that claim Liberty Mutual as the workers' compensation carrier in that matter.

1

2. The employer[1] and its insurance carrier, Liberty Mutual,[2] denied the claim. Medicare ran up a significant bill covering the chemotherapy, surgery and other treatment for Mr. Penegar's illness. When Medicare covers medical costs of a beneficiary, Medicare is considered the secondary payer. That means that if there are any insurance plans or other relevant sources of payment, they are primary payers – Medicare is only a backstop. In recent years the urgency of holding primary payers fully and promptly accountable has increased as the solvency of federal entitlement programs has deteriorated. As a result, Congress and the Department of Health and Human Services ("HHS") have promulgated strict statutes, rules and technical guidance imposing duties on insurers and their cohorts[3] to track liabilities, report accurately, and reimburse promptly.

3. The undersigned co-counsel litigated Mr. Penegar's workers' compensation claim, first as a living claim while he was alive, then with a death claim added after he died. While Liberty Mutual contested its duty to pay Mr. Penegar's medical expenses, it lost that battle. The North Carolina Industrial Commission ("NCIC") found that Liberty Mutual was obligated to cover Mr. Penegar's medical expenses and to reimburse Medicare. That finding was made by the Deputy Commissioner in an order dated April 2016 more than four years ago. That order was affirmed and is binding. However, within the time period when it was supposed to do so, Liberty Mutual not reimbursed Medicare.

4. Medicare has now advised Ms. Penegar that it seeks her whole workers' compensation settlement – less than $20,000 but which represents meaningful money to her –

---

[1] United Parcel Service, Inc. ("UPS"). It is not named as a party herein.
[2] Both Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company are listed in the workers' compensation matter. Thus, both are named, and are collectively referenced as "Liberty Mutual."
[3] Verisk Analytics, Inc. and its subsidiary ISO Claims Partners, Inc. are named as they played an active role in managing the workers' compensation plan and Medicare reporting.

toward satisfying the unpaid Medicare bill. She would not have gotten this letter had Defendants met their Medicare responsibilities.

5.      To address situations like this, the Medicare statute provides for a private cause of action by which a civil litigant like Ms. Penegar may bring suit against the recalcitrant carrier who has shortchanged Medicare, for double damages. The double damages provision is meant to incentivize the private claimant to sue. Medicare can receive its share and the private claimant can still net an award. Ms. Penegar brings that claim here.

6.      Defendants cannot argue that it needs more time to contest the amount of money Medicare claims it is entitled to reimbursement for. Mr. Penegar died more than five years ago. His medical care ended then. Medicare has totaled up the bills and sent notices. It would be absurd for Defendants to claim that they need more time to quibble with the bills. As discussed below, the NCIC ordered Liberty Mutual very clearly that it "MUST" pay Medicare -- this capital-letter emphasis is in the order. But Liberty Mutual has not paid back a cent.

7.      In addition, Plaintiff respectfully requests certification of a class under Rule 23. Ms. Penegar shares common issues with other workers' compensation claimants. These individuals have far less power and resources than Defendants. Bringing this claim and addressing these issues involves resources properly shared across a class. Absent class relief, unpaid Medicare reimbursements for such individuals may never be redressed.

## II.      PARTIES.

### A.      Plaintiff.

8.      Plaintiff Carra Jane Penegar resides in Monroe, Union County, North Carolina. She is the widow of her late husband, Johnny Ray Penegar, Jr. and is authorized to bring this action as

3

the Executrix of his Estate, pursuant to letters testamentary issued by the Clerk of Court for the Superior Court of Union County on April 22, 2015, in proceeding No. 15E0369.

**B.** **Defendants**.

9. Defendant Liberty Mutual Insurance Company is a corporation organized under the laws of the State of Massachusetts with a principle place of business in Boston, Mass. It may be served with process at its office at 175 Berkeley Street, Boston, MA 02116; or, c/o Registered Agent, Corporation Service Company, 84 State Street, Boston, MA 02109; or, c/o North Carolina Department of Insurance, 1201 Mail Service Center, Raleigh, NC 27699-1201.

10. Liberty Mutual Group, Inc. owns 100% of Liberty Mutual Insurance Company. LMHC Massachusetts Holdings, Inc. owns 100% of Liberty Mutual Group, Inc. Liberty Mutual Holding Company, Inc. owns 100% of LMHC Massachusetts Holdings, Inc. Liberty Mutual Insurance Company has FEIN 04-1543470 and NAIC No. 23043. Its lines of business for which it is registered include 49-15, Workers Compensation & Employers Liability Insurance.

11. Defendant Liberty Mutual Fire Insurance Company is a corporation organized under the laws of the State of Wisconsin with a principle place of business in Boston, Mass. It may be served with process at the same addresses as are listed above for Liberty Mutual Insurance Company. "Liberty Mutual Fire Insurance Company" appears on one or more of the forms[4] filed in the relevant underlying workers' compensation action.

12. Liberty Mutual Group, Inc. owns 100% of Liberty Mutual Fire Insurance Company. LMHC Massachusetts Holdings, Inc. owns 100% of Liberty Mutual Group, Inc. Liberty Mutual Holding Company, Inc. owns 100% of LMHC Massachusetts Holdings, Inc. Liberty Mutual Fire Insurance Company has FEIN 04-1924000 and NAIC No. 23035.

---

[4] *See* Form 61 Denial of Workers' Compensation Claim dated Nov. 18, 2014.

13.     Defendant Verisk Analytics, Inc. is a corporation incorporated under the laws of the State of Delaware and with a principal place of business located at 545 Washington Boulevard, Jersey City, NJ 07310-1686.  It may be served with process at that address or c/o its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  Verisk Analytics, Inc. is a publicly traded company.

14.     Defendant ISO Claims Partners, Inc. is a corporation incorporated under the laws of the State of Delaware and with a principal place of business at 400 Riverpark Drive, Suite 400, North Reading, MA 01864.  It may be served with process at that address or c/o its registered agent, Corporation Service Company, 84 State Street, Boston MA 02109, or c/o its parent company, Verisk Analytics, Inc.

III.     **JURISDICTION AND VENUE.**

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Count I raises a federal question under 42 U.S.C. § 1395y(b)(3)(A) and the remaining Counts are encompassed by supplemental jurisdiction under 28 U.S.C. § 1367(a).  This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) as this is an action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States; or under 28 U.S.C. § 1332(d)(2)(A) in that this is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which one or more class members are citizens of a State different from any defendant.

16.     Venue lies in this district under 28 U.S.C. § 1391(b)(2) because this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or under subsection (b)(3) in that the Defendants are subject to the Court's personal jurisdiction in this district.

## IV.  FACTS.

### A.  Medicare -- background in general.

17.     Statutory background is provided below in that the Medicare statutory system is complex and reticulated.  Medicare is a health insurance program sponsored mainly by the federal government and funded in part by payroll deductions for workers such as Mr. Penegar in the past.[5] The Medicare program was established in 1965 to provide health insurance benefits for persons above 65 years of age, persons who are disabled and persons with end-stage renal disease. Subchapter XVIII of Chapter 7 of Title 42 of the United States Code is entitled "Health Insurance for Aged and Disabled," and is known as the Medicare statute.[6]

18.     The Medicare statute has several parts. Pertinently, Medicare Part A, entitled "Hospital Insurance Benefits for Aged and Disabled," provides coverage for hospital, related post-hospital, and home health services, as well as hospice.[7] Medicare Part B, entitled "Supplementary Medical Insurance Benefits for Aged and Disabled," is a federally-subsidized voluntary health insurance program that provides insurance for a portion of some medical expenses not in Part A coverage.[8] HHS contracts with fiscal intermediaries to administer claims under the program.[9] The Centers for Medicare and Medicaid Services ("CMS") is an operating division within the HHS which issues Medicare regulations on behalf of the HHS.[10] The Medicare statute confers rights and responsibilities upon the Secretary of the DHHS, who in turn has delegated authority to CMS.

---

[5] *See* Woody R. Clermont, a Brief Introduction to Medicare and the Office of Medicare Hearings and Appeals, Pitt. J. Environmental & Public Health Law, 2011, Vol. 5:103, at pp. 103-05.
[6] 42 U.S.C. §§ 1395 to 1395lll.
[7] *See* 42 U.S.C. §§ 1395c to 1395i-5.
[8] *See* 42 U.S.C. §§ 1395j to 1395w-6.
[9] 42 U.S.C. §§ 1395h(a) (Part A, referencing "medicare administrative contractors"), 1395u(a) (Part B).
[10] CMS, Justification of Estimates for Appropriations Committees, 2020, executive summary, p. 1.

6

19.     "Traditional Medicare" consists of Parts A and B, which describe and regulate traditional fee-for-service, government-administered Medicare. These provisions entitle eligible persons to have CMS pay medical providers directly for hospital and outpatient care.

20.     Part C, dating from 1997, allowed for the creation of Medicare Advantage Plans ("MAPs") run by Medicare Advantage Organizations ("MAOs").  Under Part C, Medicare-eligible persons may elect to have a MAO rather than CMS provide Medicare benefits.[11]

**B.     MSP statute enacted in 1980.**

*21.*     From its inception in 1965 until 1980, Medicare generally paid for medical services whether or not the recipient was also covered by another health plan. Stated differently, generally Medicare was the underlined primary payer of health care costs for Medicare-eligible individuals.  However, even at this time, for workers' compensation plans, Medicare expected reimbursement.[12]

22.     Beginning in 1980, however, Congress enacted a series of cost-cutting amendments, collectively known as the Medicare as Secondary Payer or MSP statute.[13] Congress intended to "reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary insurance coverage."[14]

23.     The MSP statute tries to achieve this cost-cutting, cost-shifting objective in two ways.  First, it bars Medicare payments where payment has already been made or can reasonably be expected to be made promptly by a primary plan.[15]  The regulations define "promptly" to mean

---

[11] 42 U.S.C. §§ 1395w-21 to 1395w-29; see Balanced Budget Act of 1997, Pub. L. 105-33.
[12] Woody R. Clermont, a Brief Introduction to Medicare and the Office of Medicare Hearings and Appeals, Pitt. J. Environmental & Public Health Law, 2011, Vol. 5:103, at p. 105 & n. 14.
[13] *See Brown v. Thompson*, 374 F.3d 253, 258 (4th Cir. 2004).
[14] *Brown*, 374 F.3d 253, 258, quoting *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003).
[15] 42 U.S.C. § 1395y(b)(2)(A).

7

"payment within 120 days after receipt of the claim."[16]  Second, "when Medicare makes a payment that a primary plan was responsible for, the payment is merely conditional and Medicare is entitled to reimbursement for it."[17]  Fiscal intermediaries process claims submitted by beneficiaries' health-care providers.  Part of their duty is to ensure that Medicare does not pay for services covered by private insurers who are primary payers aka primary plans, and to obtain reimbursement for Medicare when this does occur.

24.     Stated differently, the MSP statute makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer.[18]  This means that if payment for covered services has been or is reasonably expected to be made by someone else, Medicare does not have to pay. In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly. Such payment is conditioned on Medicare's right to reimbursement if a primary plan later pays or is found to be responsible for payment of the item or service.[19]

25.     Medicare acts as a "secondary insurer" because "if a beneficiary has primary medical insurance, the private insurer — and not Medicare — is the payor of first resort."[20]  This concept is critical because it imposes a heightened duty on Defendants to avoid delaying, obstructing or misleading in their reporting and reimbursement obligations.  They are the primary

---

[16] 42 C.F.R. § 411.21.
[17] 42 U.S.C. § 1395y(b)(2)(B).
[18] *See United States v. R.I. Insurers' Insolvency Fund,* 80 F.3d 616, 618 (1st Cir. 1996) (citing H.R.Rep. No. 96-1167, at 389 (1980), reprinted in 1980 U.S.C.C.A.N. 5526, 5752); *Glover v. Liggett Group, Inc.,* 459 F.3d 1304, 13008-9 (11th Cir. 2006).
[19] *See id.; and see* 42 U.S.C. § 1395y(b)(2).
[20] *United Seniors Assoc., Inc. v. Philip Morris, USA*, No. 05-11623-RGS, 2006 U.S. Dist. LEXIS 60729, *3-4 (D. Mass. Aug. 28, 2006).

8

payer, even if their payment duty may be delayed by circumstances. They cannot be allowed to cut corners or give inaccurate information in the course of reporting and paying to CMS.

26. The intent of Congress in shifting the burden of primary coverage to private carriers was to place the burden where it could best be absorbed, considering that these insurers had already assumed such burdens, and received the benefits, in contracts with the insureds.[21] The MSP statute prohibits Medicare from making any payment to a beneficiary for medical expenses if payment has been made, or can reasonably be expected to be made promptly under "<u>a workmen's compensation law or plan</u>."[22] Should Medicare determine that the primary insurer has not paid and that no prompt payment reasonably can be expected, Medicare may pay the beneficiary up front, but such payment is conditioned on Medicare's right to reimbursement in the event that a primary plan later is found responsible for payment of the item or service.[23]

27. Medicare's rights here have been described as something stronger than a lien. Defendants as primary payers have strict duties to honor this interest.

C. **Addition of government and private causes of action, 1984-89.**

28. Faced with the continuing issues of funding Medicare, in the Deficit Reduction Act of 1984, Congress amended the MSP statute to provide the government with an explicit statutory right of recovery for Medicare overpayments against primary payers.[24]

---

[21] "[M]edicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract." H.R. Rep. No. 96-1167, reprinted in 1980 U.S.C.C.A.N. 5526, 5752, quoted in *Manning,* 254 F.3d at 396.
[22] 42 U.S.C. § 1395y(b)(2)(A)(ii) (emphasis added).
[23] *See* 42 U.S.C. § 1395y(b)(2)(B) (conditional payment).
[24] *See* Pub.L. No. 98-369, § 2344(a)(3), 99 Stat. 494 (1984); *United States v. Blue Cross and Blue Shield of Michigan*, 726 F. Supp. 1517, 1519 (E.D.Mich. 1989) (reviewing history of the MSP amendments); *Provident Life and Acc. Ins. Co. v. United States,* 740 F. Supp. 492, 499 (E.D. Tenn. 1990) (same).

9

29.     In 1986, Congress created the MSP private cause of action.[25]  42 U.S.C. § 1395y(b)(3)(A).  Its purpose is to help the government recover its fair share of payments made to Medicare beneficiaries. The private cause of action helps the government recover conditional payments from insurers or other primary payers, encourages private parties to enforce Medicare's rights, and saves money for the Medicare system thereby assisting its solvency.[26]

30.     A Medicare beneficiary may be more aware than the government of whether other entities may be responsible. Without the double damages, the beneficiary might not be motivated to take arms against a recalcitrant insurer because Medicare may have already paid the expenses and the beneficiary has little to gain. With double damages, the beneficiary can pay back the government for its outlay and still have money left over.[27]

31.     In 1989, the private cause of action provision was altered to what is its current form: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)"[28] of the MSP statute, as discussed further below.

D.     **1997 changes**.

32.     As noted, Medicare Part C, in 1997,[29] created the program known as Medicare Advantage.  The program allows Medicare enrollees to obtain benefits through private insurers

---

[25] Pub. L. No. 99-509, § 9319, 100 Stat. 1874 (1986) (codified as amended at 42 U.S.C. § 1395y(b)(3)(A)).
[26] *Netro v. Greater Baltimore Med. Ctr.,* 891 F.3d 522, 524 (4th Cir. 2018) (discussing legislative history).
[27] *Netro,* 891 F.3d 522, 524. If Medicare has paid $100,000, it gets $100,000 minus procurement costs under 42 C.F.R. § 411.37 or 42 C.F.R. § 411.47, and the plaintiff gets $100,000 minus the plaintiff's share of procurement costs.
[28] 42 U.S.C. § 1395y(b)(3)(A); *Michigan Spine and Brain Surgeons, PLLC v. State Farm Mutual Ins. Co.*, 758 F.3d 787, 790 (6th Cir. 2014) (discussing 1989 amendment); *Bio-Medical Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 298-99 (6th Cir. 2011) (White, J., concurring) (same).
[29] 42 U.S.C. §§ 1395w-21 - 1395w-29; Pub. L. 105-33.

called MAOs operating MAPs instead of obtaining those benefits directly from the government.[30] Part C provides that the CMS pays a MAO a fixed amount for each enrollee, per capita (a "capitation"), and the MAO then administers Medicare benefits for those enrollees and assumes the risk associated with insuring them.[31]

33.     The amending of the Medicare statute to introduce MAOs has led to case law further construing the private cause of action provision, as MAOs or their assignees have brought private causes of action against primary plans.[32]

**E.     2003 changes.**

34.     In 2003, the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA") added additional entitles to the definition of a "primary plan."[33] Today it includes group health plans, workers' compensation plans, automobile or liability insurance plan (including self-insured plans), and no-fault insurance.[34]

35.     Congress strengthened the private cause of action by clarifying what is a demonstrated responsibility to pay: "A primary plan's responsibility ... may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means."[35] And reimbursement to Medicare is no longer tied to anticipation of prompt payment.[36]

---

[30] 42 U.S.C. § 1395w-21(a).
[31] *In re Avandia Mktg.*, 685 F.3d 353, 357-58 (3rd Cir. 2012).
[32] *E.g.*, *MAO-MSO Recovery II, LLC v. Gov't Emples. Ins. Co.*, 2018 WL 999920, 2018 U.S. Dist. LEXIS 27654 (D. Md. Feb. 21, 2018).
[33] *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 117 Stat. 2066 (2003), Pub. L. No. 108-173 § 301(b), codified at 42 U.S.C. § 1395y(b)(2)(A).
[34] 42 U.S.C. § 1395y(b)(2)(A).
[35] 42 U.S.C. § 1395y(b)(2)(B)(ii).
[36] 42 U.S.C. § 1395y(b)(2)(A).

36. The 2003 amendments reflected a Congressional intent to strengthen and broaden the scope of the provision, which fairly informs how the provision should be applied.[37]

**F.  2007 changes**.

37. In 2007, Congress enacted Section 111 of the Medicare, Medicaid, and State Children's Health Insurance Program ("SCHIP") Extension Act of 2007.[38] The legislation broadened the duties of stakeholders including insurance companies to report timely and accurate information to CMS.  CMS designed an internet-based reporting system in this regard.

38. Congress increased enforcement mechanisms by imposing a reporting requirement on anyone considered to be a primary payer under the MSP Act. The act also imposed mandatory third-party insurer reporting requirements in an effort to protect Medicare's interests.[39]

**G.  2013 changes**.

39. On January 10, 2013, the Medicare IVIG Access and Strengthening Medicare and Repaying Taxpayers ("SMART") Act of 2012 was signed into law.[40] Title II of the SMART Act made a number of changes to the MSP statute, 42 U.S.C. § 1395y(b)(2).

40. The SMART Act gives claimants and responsible reporting entities (RREs, per 42 U.S.C. § 1395y(b)(8)) access to information on claims for which conditional payments have been made. CMS makes information available to claimants and RREs through a secure website known as the Medicare Secondary Payer Recovery Portal ("MSPRP").

41. The Act established a three year statute of limitations with regard to direct actions brought by the government. "An action may not be brought by the United States under this clause with respect to payment owed unless the complaint is filed not later than 3 years after the date of

---

[37] *See Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (explaining 2003 amendments).
[38] Pub. L. No. 110-173.
[39] Eric Helland, Rand Report, The Role of Health Care Liens in Litigation and Recovery, 2018, p. 9.
[40] Pub. L. No. 112-242.

the receipt of notice of a settlement, judgment, award, or other payment made pursuant to paragraph (8) relating to such payment owed." 42 U.S.C. § 1395y(b)(2)(B)(iii).

**H.** **Enforcement mechanisms under the MSP statute.**

42. The MSP Act made Medicare an entitlement of last resort, available only if no private party was liable.[41] Where a private party responsible for medical costs does not promptly pay, Medicare may pay up front, so long as the responsible party reimburses.[42] Congress has enacted tools to ensure that primary payers pay, including:[43]

a. A government action against any entity responsible as a primary plan.[44]
b. A private cause of action with double recovery.[45]
c. A right of subrogation for the United States.[46]

**I.** **The private cause of action – elements.**

43. The MSP statute "authorizes a private cause of action for double damages where a recalcitrant payer 'fails' to reimburse Medicare."[47] "There are three elements to an MSP private cause of action: (1) a primary plan, (2) that is responsible to pay for an item or service, and (3) that failed to make the appropriate payment to Medicare for the item or service."[48]

44. 42 U.S.C. § 1395y(b)(3)(A) states: "(3) Enforcement. (A) Private cause of action. There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary

---

[41] *Netro,* 891 F.3d 522, 524 (4th Cir. 2018) (so stating), citing *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1234 (11th Cir. 2016).
[42] *Netro,* 891 F.3d at 524, citing 42 U.S.C. § 1395y(b)(2)(B).
[43] *Netro,* 891 F.3d at 524.
[44] 42 U.S.C. § 1395y(b)(2)(B)(iii).
[45] 42 U.S.C. § 1395y(b)(3)(A).
[46] 42 U.S.C. § 1395y(b)(2)(B)(iv).
[47] *Netro,* 891 F.3d 522, 524 (4th Cir. 2018).
[48] *Humana, Inc. v. Shrader Sc Assocs., LLP*, 584 B.R. 658, 677 (S.D. Tex. Bankr. March 16, 2018), *citing Glover v. Philip Morris USA,* 380 F. Supp. 2d 1279, 1290 (M.D. Fla. 2005), *aff'd sub nom, Glover v. Liggett Group, Inc.,* 459 F.3d 1304 (11th Cir. 2006).

13

payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." The "paragraph 1" that is referenced is 42 U.S.C. § 1395y(b)(1). That part of the statute addresses "group health plans" and so, does not apply here.[49] Paragraph (2)(A) does apply. It prohibits Medicare from paying for services when a primary plan is responsible, "except as provided in subparagraph (B)." 42 U.S.C. § 1395y(b)(2)(A). Subparagraph (B) states that Medicare can pay for services, and a primary plan must then reimburse Medicare "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii).[50]

45.     As to what constitutes proof of "responsibility to make payment," the statute provides: "A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). "Other means" may include a settlement, award or contractual obligation.[51]

46.     Liberty Mutual is liable under the private cause of action as a primary plan within the meaning of the MSP statute.[52] The term "primary plan" is defined to include "a workmen's compensation law or plan." 42 U.S.C. § 1395y(2)(A)(ii); 42 C.F.R. § 411.21. Verisk is jointly and severally liable for their direct involvement in managing a primary plan.

47.     The primary payer, aware of Medicare's secondary payer status, aware of its potential liability, aware of the prospect of an order, award, judgment or settlement by which it is

---

[49] *See Estate of McDonald v. Indemnity Ins. Co.,* No. 3:12-CV-577, 2014 U.S. Dist. LEXIS 121902 (W.D. Ky. Sept. 2, 2014) (discussing private cause of action provision and the "Paragraph (1)" reference).
[50] *Estate of McDonald,* 2014 U.S. Dist. LEXIS 121902, *7 (so noting).
[51] *See* 42 C.F.R. § 411.22(b).
[52] 42 U.S.C. § 1395y(b)(3)(A) (cause of action allowed against private plan).

14

determined responsible, and then aware of its fruition, must act in strict and transparent compliance with Medicare law to acknowledge and reimburse based on that responsibility.

48. 42 U.S.C. § 1395y(b)(8) covers the "[r]equired submission of information by or on behalf of … workers' compensation laws and plans."  Defendants were to provide to Medicare information covering the "identity of the claimant," as well as such other information as will enable Medicare "to make an appropriate determination concerning coordination of benefits, including any applicable recovery claim."  The information has to be reported within a set period "after the claim is resolved through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)."  42 U.S.C. § 1395y(b)(8)(C).

49. Under the Section 111 NGHP User Guide, "Information regarding a settlement, judgement, award or other payment must be reported within 135 calendar days (approximately 4.5 months) of the TPOC Date."[53]  TPOC is a Medicare acronym meaning Total Payment Obligation to Claimant.  The "TPOC Date" here means the date of the settlement approval.  Liberty Mutual is deemed an RRE.  CMS has assigned RREs with a quarterly reporting schedule when they are required to report. Each RRE will report once a quarter with all the applicable claims which have occurred in the last 135 days prior to the report.[54]

50. Here, the Deputy Commission found Liberty Mutual liable for medical reimbursement to Medicare, the Full Commission affirmed, the Court of Appeals affirmed, the State Supreme Court denied certiorari and then a settlement was NCIC-approved. More than 135 days have passed since Liberty Mutual had notice of the order approving the settlements for the life and death claims on June 3 and 5, 2020 respectively as shown further below.  Defendants are

---

[53] Chapter 6: Claim Input File, at p. 6-62.
[54] See CMS 2017 slides, at slide 40, noting that "any add record received on a quarterly file submission will be marked as late if the TPOC Date is more than 135 days older than the start date of that same file submission period." CMS slide presentation, 2017, available at www.cms.gov. See also slide 42.

15

past their deadline.  *Cf.* 42 U.S.C. § 1395y(b)(2)(B)(ii) (describing that if payment is not made after "notice of, or information related to, a primary plan's responsibility for such payment or other information is received," then Medicare may charge interest on the amount owed); and see CMS guidance and technical manuals including the Section 111 NGHP[55] User Guide.

51.    A plaintiff suing under the private cause of action provision has Article III standing to bring suit, regardless of the fact that the money that the claimant seeks to recover was owed to the government.[56]  The mere fact the plaintiff has proven standing does not automatically mean the plaintiff is entitled to the double damages.[57] However, in the class action context that individualized issues as to damages may not bar class certification.[58]

52.    Courts have found the private cause of action provision under 42 U.S.C. § 1395y(b)(3)(A) applicable where the private claimant sues regarding a failure by a primary plan to pay Medicare in a workers' compensation context,[59] as well as in a workers' compensation context specifically related to mesothelioma.[60]

J.    **Statute of limitations.**

53.    The MSP statute states that "[a]n action may not be brought by the United States under this clause with respect to payment owed unless the complaint is filed not later than 3 years after the date of the receipt of notice of a settlement, judgment, award, or other payment made

---

[55] NGHP means Non Group Health Plan.  Because the instant matter involves workers' compensation plans it does not involve group health plans – so in Medicare parlance this is an NGHP matter.

[56] *Netro,* 891 F.3d at 524-25; *see also O'Connor v. Mayor & City Council of Baltimore*, 494 F. Supp. 2d 372, 374 (D. Md. 2007).

[57] *See Netro, supra* (finding standing but no entitlement to damages).

[58] *E.g., Gunnells v. Healthplan Servs.,* 348 F.3d 417, 426-27 (4th Cir. 2003).

[59] *Manning v. Utils. Mut. Ins. Co*., 254 F.3d 387, 391-92 (2nd Cir. 2001) (New York workers' compensation law); *Estate of McDonald v. Indemnity Ins. Co. of North America,* No. 3:12-CV-577, 2014 U.S. Dist. LEXIS 121902 (W.D. Ky. Sept. 2, 2014) (Kentucky workers' compensation).

[60] *O'Connor*, 494 F. Supp. 2d 372, 374 (D. Md. 2007) (Maryland workers' compensation -- mesothelioma); *Richardson v. PCS Phosphate Co*., No. 3:16-cv-00068-GCM, 2016 U.S. Dist. LEXIS 122354, 2016 WL 4728109 (W.D.N.C. Sept. 9, 2016) (NC workers' compensation -- mesothelioma).

16

pursuant to paragraph (8) relating to such payment owed." 42 U.S.C. § 1395y(b)(2)(B)(iii). Paragraph (8), in turn, discusses the reporting requirements by which those outside of the Medicare agency are required to report information into the system. In other words, the statute requires stakeholders like Liberty Mutual or Verisk to take the laboring oar and report information. Logically, if a stakeholder failed to give Medicare information about a judgment or settlement, etc., then the three-year statutory period could be tolled.[61]

54. The statute of limitations does not explicitly state that it applies to a private cause of action. However, Plaintiffs define their class under the assumption that it should apply. It would not make sense that a private plaintiff can bring a claim under the private cause of action provision that the government could not bring under its provision. Further, it is conceivable that the government may want to intervene in a private claim, given the aligned interests. Further, even if the MSP statute of limitation does not expressly apply, under the traditional analysis with regard to what analogous statute of limitations to borrow, this one is closest at hand.[62]

55. In the case of the Plaintiff, the order rendering final the NCIC award and the orders approving settlement of the workers' compensation claims occurred within the last three years.[63] Plaintiffs have incorporated the statute of limitations provision into their class definition herein.

---

[61] Another three-year period discussed at 42 U.S.C. § 1395y(b)(2)(B)(vi) is inapplicable outside the context of group health plans as primary payers. Courts have distinguished this provision from the three-year statute of limitations. *MSPA Claims 1, LLC v. Kingsway Amigo Ins.*, 2020 WL 728625 (11th Cir. Feb. 13, 2020).

[62] *MSP Recovery Claims Series LLC v. Plymouth Rock Assurance Corp.*, No. 18-cv-11702-ADB, 2019 U.S. Dist. LEXIS 119499, 2019 WL 3239277 (D. Mass., July 18, 2019) ("Although the private cause of action is silent as to the limitations period, see 42 U.S.C. § 1395y(b)(3)(A), the parties seemingly agree that a three-year statute of limitations applies…."); *MSPA Claims 1, LLC v. Bayfront HMA Med. Ctr.*, No. 17-CV-21733, 2018 U.S. Dist. LEXIS 44913, 2018 WL 1400465, at *6 (S.D. Fla. Mar. 20, 2018) (holding that three-year statute of limitations applies to a private action under the MSPA).

[63] *Compare MSPA Claims 1, LLC v. Bayfront HMA Med. Ctr.*, No. 17-CV-21733, 2018 U.S. Dist. LEXIS 44913, 2018 WL 1400465, at *6 (S.D. Fla. Mar. 20, 2018) (indicating that the statute of limitations begins to run after notice of a settlement, judgment, award, or other payment); *MSP Recovery Claims Series LLC v. Plymouth Rock Assurance Corp.*, 2019 U.S. Dist. LEXIS 119499, *24-28, 2019 WL 3239277 (D. Mass., July 18, 2019) ("The Court assumes for the purposes of the motion to dismiss that the statute of limitations began to run no earlier than the date Plymouth settled A.C.'s claims").

**K.** **Standing and ripeness**.

56.     Courts have found that standing does not exist for a civil plaintiff to sue under the private cause of action provision where the named plaintiff was not a Medicare beneficiary connected to the alleged failure to timely reimburse.[64] Here, the individual Plaintiff is connected in that she is the personal representative of the estate of a Medicare beneficiary whose medical bills are at issue. Each class member herein is a Medicare beneficiary (or representative) who had medical costs incurred and otherwise meets the private cause of action requirements.[65]

57.     Further, on information and belief Plaintiff, and class members, were paid less by Medicare than they would have been by the primary payer, and, their medical providers were paid less than the original amounts owed under their workers' compensation systems and this was to the detriment of his medical care.[66]

58.     Plaintiff has complied with all conditions precedent to suit, including by factual allegation that Medicare made payments on the claimant's behalf; and that the primary plan has been determined responsible for paying the benefits within the meaning of the MSP statute.[67]

**L.** **Summary of MSP claim for Plaintiff and class.**

59.     Based on the allegations above, to recover on the private cause of action, a claimant must adequately allege and prove:

---

[64] *See United Seniors Ass'n v. Philip Morris USA,* 500 F.3d 19, 22 (1st Cir. 2007).
[65] *See Humana v. Medical Plan Inc. v. Western Heritage Ins. Co*., 832 F.3d 1229 (11th Cir. 2016) (noting that Medicare beneficiaries can bring a claim under the MSPA for their medical costs paid by Medicare).
[66] *See Gucwa v. Lawley*, 2018 WL 1791994, 2018 U.S. App. LEXIS 9428 (6th Cir. Apr. 16, 2018) (unpub.) ("[F]or instance, a private plaintiff may allege that they were paid less by Medicare than they would have been paid by the primary payer."); *Bio-Medical Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 296 n.17 (6th Cir. 2011).
[67] *Geer v. Amex Assurance Co.,* No. 09-11917, 2010 U.S. Dist. LEXIS 66834, *9-10 (E.D. Mich. July 6, 2010) (describing these "two important conditions); *O'Connor v. Mayor and City Council of Baltimore,* 494 F. Supp.2d 372 (D. Md. 2007) (firefighter brought an MSP action against his employer to repay his medical bills; firefighter had obtained a judgment against his employer by the Maryland Workers' Compensation Commission; claim was ripe).

18

- The claimant is a Medicare beneficiary who received an item or service.

- Medicare made a payment for the item or service.

- Defendant is a primary plan within the meaning of the statute or is directly involved in managing a primary plan to the point of being jointly and severally liable.

- Defendant has a demonstrated responsibility for the payment as per a judgment, settlement, settlement, award, or contractual obligation.

- The claim is brought not later than three years after the date of the receipt of notice by the government of a settlement, judgment, or award, if notice was given (the defendant cannot be excused if it simply never gave any notice and left the government in the dark).

- Defendant has failed to timely make the "primary payment" or "appropriate reimbursement"[68] – in this regard, if the defendant has violated the Medicare statutory or regulatory requirements as of the date the plaintiff sues, then an effort by the defendant to subsequently cure the nonpayment does not moot the action.[69] Otherwise the private action provision would be meaningless because plaintiffs would invest resources in determining the malfeasance of the carrier and developing the claim, only to have the carrier pay up belatedly and claim no harm, no foul. On the other hand, if the deadline for the defendant to take appropriate action has not yet expired, the claim is premature.[70] Otherwise a defendant could be liable for double damages when it was fully intending the pay by the deadline.

- Damages: "double the amount otherwise provided."[71] Medicare may have a subrogation interest against the recovery to the extent of its conditional payments, subject to a reduction for procurement costs.

60. Applying those elements here, for Plaintiff and for the class:

- The claimant is a Medicare beneficiary who received an item or service;
  - Mr. Penegar was a Medicare beneficiary who received medical treatment for his mesothelioma, for which there was a judgment,

---

[68] 42 U.S.C. § 1395y(b)(3)(A).

[69] *Estate of McDonald,* 2014 U.S. Dist. LEXIS 121902, *9 (W.D. Ky. Sept. 2, 2014) (noting that "an errant worker's compensation carrier has now paid Medicare what it owed").

[70] *Netro,* 891 F.3d 522, 529 (4th Cir. 2018) (noting "it is not apparent that GBMC violated the MSP Act").

[71] 42 U.S.C. § 1395y(b)(3)(A); 42 C.F.R. § 411.31 (addressing payments and charges); *Bio-Medical Applications of Tenn. v. Central States Southeast & Southwest Areas Health & Welfare Fund,* 656 F.3d 277, 279, 294-97 (6th Cir. 2011) (discussing issues as to how to measure double damages); *Leggette v. B.V. Hedrick Gravel & Sand Co.*, 2006 U.S. Dist. LEXIS 98297, *30-31 (W.D.N.C. May 24, 2006) (same).

19

award, and settlement under the North Carolina workers' compensation system;

- ▪ The class is defined to include individuals who are Medicare beneficiaries who received medical care for an injury or disease in which there was a judgment, award, or settlement under a workers' compensation system;

- Medicare made a payment for the item or service;
  - ▪ Medicare made payments to medical providers for care for Mr. Penegar.
  - ▪ The class is defined to include individuals for whom Medicare made payments to their medical providers;

- Defendant is a primary plan within the meaning of the statute or is directly involved in managing a primary plan to the point of being jointly and severally liable.
  - ▪ Liberty Mutual was the carrier for a primary plan. Verisk is alleged to be so involved in the primary plan management.
  - ▪ The class is defined to include individuals for whom Liberty Mutual was the carrier for their primary plan, or, for whom Verisk was directly involved in the primary plan's management;

- Defendant has a demonstrated responsibility for the payment as per a judgment, settlement, settlement, award, or contractual obligation.
  - ▪ As to Mr. Penegar and his Estate, Liberty Mutual's responsibility was demonstrated by the initial Deputy Commissioner order; the Full Commission affirmance; the Court of Appeals affirmance; the settlement agreements on the life and death claims; and the orders approving those settlements;
  - ▪ The class is defined to include individuals for whom Liberty Mutual or Verisk had a responsibility for payment that is likewise so demonstrated.

- The claim is brought not later than three years after the date of the receipt of notice by the government of a settlement, judgment, or award, if notice was given.
  - ▪ This is met for Penegar.
  - ▪ The class is so limited.

- Defendant has failed to timely make the "primary payment" or "appropriate reimbursement."
  - ▪ Under the electronic portal reporting system, Defendants had a maximum of 135 days after the date of the settlement approval order, at the latest, to acknowledge responsibility and pay Medicare; they have done so.
  - ▪ The class is likewise so defined.

20

- Damages: double damages. Medicare may have a subrogation interest in one-half the double damages recovery.
  - Plaintiff is concurrently notifying Medicare of this lawsuit and of the possibility that one-half of a double damages award as to Penegar may go to Medicare per its subrogation interest.
  - Plaintiff has also given such notice to Medicare with regard to the putative class, although also informing Medicare that no class has yet been certified.

**M.** **Facts regarding Mr. Penegar and the Plaintiff.**

61.     Mr. Penegar was born on August 21, 1939. Mr. Penegar was employed by UPS for over 30 years, from approximately 1967 to 1998. He worked out of its Charlotte facility, driving a truck that delivered packages to smaller facilities for regional distribution. While working there, he was exposed to asbestos dust in the air because mechanics were servicing trucks and changing brakes inside the Charlotte facility.

62.     Mr. Penegar via paycheck deductions made payments into the U.S. government's Medicare and Social Security retirement benefits program. He paid substantial monies into the program over his years of work. He was thereby entitled, like his wife and surviving spouse, to rely on Medicare. This includes reliance on the proposition that all relevant stakeholders will comply with their primary payer reimbursement obligations to Medicare as a secondary payer, both for purposes of ensuring full payment of medical bills of Medicare-covered retirees, and more broadly, ensuring the ongoing economic viability of the Medicare program.

63.     After Mr. Penegar left UPS, he worked some other jobs, then retired completely in 2012. As of 2012, he was enrolled in the Medicare program and was a Medicare beneficiary.[72]

---

[72] See Medicare Summary Notice addressed to Mr. Penegar and dated June 15, 2012.

64.     Then, in 2013, he began to experience problems with breathing. Mr. Penegar was diagnosed with the lethal disease of mesothelioma on or about February 8, 2013. Mesothelioma is a disease for which asbestos exposure is the only known cause.

65.     Mr. Penegar received extensive medical care and treatment for his mesothelioma. This included chemotherapy and surgery. This care allowed him to have more time with his family before he ultimately died of the disease on March 26, 2015. Because he received medical care after he was retired and became enrolled in Medicare at the age of 65, the cost of the care in relevant part was covered by Medicare. However, Medicare, as the secondary payer under the law, was entitled to have any relevant primary payer pay for the medical care, charges and expenses or reimburse Medicare for what Medicare had paid.

66.     After learning his mesothelioma diagnosis, while still alive, Mr. Penegar filed a workers' compensation claim against UPS and its carrier, Liberty Mutual Insurance Company, for the mesothelioma disease that he contracted from asbestos exposure. This claim was filed before the NCIC on or about September 23, 2014.[73]

67.     Liberty Mutual Insurance Company has represented itself before the NCIC as being the insurance company bearing the risk and providing coverage for workers' compensation claims against UPS during the period of time in which Mr. Penegar had his asbestos exposure and when his workers' compensation claim arose. However, Liberty Mutual Fire Insurance Company is also listed in one or more forms filed on its behalf with the NCIC.

68.     UPS and Liberty Mutual denied the workers' compensation claim and it was litigated. On November 18, 2014, they filed a denial of the claim in the NCIC file.

---

[73] I.C. File No. 14-769356, see Form 18B dated Sept. 23, 2014. The claim alleged that his mesothelioma developed as a result of asbestos exposure during his employment with UPS.

22

69.    Meanwhile, both Mr. Penegar through his legal representative, and on information and belief the Defendants herein, received notices and information from CMS with regard to Medicare's secondary payer status.  For example, CMS sent a notice dated November 21, 2014, addressed to Mr. Penegar's counsel, stating in part:

> We would like to take this opportunity to advise you of the applicability of the Medicare Secondary Payer Laws.  Per 42 U.S.C. 1395y(b)(2) and 1862(b)(2)(A)(ii) of the Act, Medicare is precluded from paying for a beneficiary's medical expenses when payment "has been made or can reasonably be expected to be made … under a Workers' Compensation plan, an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance."  However, Medicare may pay for a beneficiary's covered medical expenses conditioned on reimbursement to Medicare from proceeds received pursuant to a third party liability settlement, award, judgment or recovery.

70.    The letter sent by CMS on November 21, 2014 bears both the CMS logo at the top left and the logo for Coordination of Benefits and Recovery, aka COB&R, at the top right. COB&R activities are managed by CMS working with the Benefits Coordination & Recovery Center ("BCRC") and the Commercial Repayment Center ("CRC").  Per guidance found on the CMS website, the BCRC or CRC are responsible for the recovery of workers' compensation and other NGHP claims where the beneficiary must repay or where a workers' compensation entity is the debtor.  Together, the BCRC and CRC comprise all COB&R activities.

71.    The COB&R process relies upon accurate information from RREs, that is, Responsible Reporting Entities.   Plaintiff alleges that during the pertinent times, Defendants have used uniform policies and procedures which resulted in violations of their primary payer duties as RREs adversely impacting the Plaintiff and the putative class.

72.     In the forms filed by Mr. Penegar and Plaintiff in the workers' compensation proceedings it was clearly pled that the claimant was seeking *inter alia* for the Defendants to pay his relevant medical expenses regarding his mesothelioma.[74]

73.     On February 5, 2015, CMS sent a letter addressed both to workers' compensation counsel for the claimant, and PMSI, an agent for Liberty Mutual.  The letter begins with, "Dear Liberty Mutual."[75]  The letter describes "Medicare's priority right of recovery under the Medicare Secondary Payer provisions," that "conditional payments are subject to reimbursement to Medicare" and that "Medicare has identified $34,295.79 in conditional payments…."

74.     On March 26, 2015, Mr. Penegar passed away.  On April 22, 2015, his wife, the Plaintiff, was appointed as his Executrix.  On June 6, 2015, she filed a new Form 18B for the death claim to accompany the prior-filed living mesothelioma claim, which also remained pending.

75.     On October 13, 2015, CMS sent an itemization reflecting $121,879 with regard to the medical care costs for Mr. Penegar's mesothelioma.

76.     On December 7, 2015, Mr. Pross wrote to the NCIC requesting that there be assigned two separate NCIC file numbers, given as there was a life claim, and a death claim.  The first claim was assigned IC No. 14-769356.  The new claim was assigned IC No. 15-742389.[76]

---

[74] Form 33 filed Dec. 9, 2014.

[75] Letter dated Feb. 5, 2015, referencing Medicare number 239505591A, Case Identification Number 20150 15090 00263, and date of incident Feb. 8, 2013.

[76] Thus, in addition to the claim Mr. Penegar brought for workers' compensation benefits as a living mesothelioma claimant, his widow and estate representative, Mrs. Penegar, brought a second claim for death benefits after he died.  The two claims retained separate NCIC file numbers, in recognition of the fact that the law provides different categories of benefits.  The capacities of the Plaintiff in the claims are also different, with Mrs. Penegar suing in her personal capacity as the real party in interest in the death claim, and suing as personal representative of her husband's estate as the real party in interest in the life claim.

24

77. On April 15, 2016, an Opinion and Award ("O&A") was issued by Robert Harris, the NCIC Deputy Commissioner. The O&A recited the facts and procedural background reflecting that the parties had vigorously litigated the matter. The O&A recited

78. The O&A recited a stipulation that "Liberty Mutual Insurance Company" was the carrier on the risk. The O&A made detailed findings of fact with regard to UPS and Liberty Mutual's liability. The O&A included references to the Medicare secondary payer; e.g. at finding of fact number 52: "As of February 5, 2015, Medicare had a conditional payment lien, related to treatment provided to Plaintiff for his mesothelioma, in the amount of $34,295.79."[77]

79. The O&A states in its conclusions of law that, "Deceased Plaintiff's estate is entitled to have Defendants pay for all the medical treatment that deceased Plaintiff received for his compensable mesothelioma, including but not limited to imaging, therapy, surgery, hospitalization, prescriptions, and mileage. N.C. Gen. Stat. § 97-25."[78] The O&A under its "award" section further provides:[79]

> Defendants SHALL pay for all the medical treatment that Plaintiff received for his compensable mesothelioma, including but not limited to imaging, therapy, surgery, hospitalization, prescriptions, and mileage. To the extent that deceased Plaintiff/deceased Plaintiff's estate and/or any third party, including Medicare, paid for any such treatment, Defendants SHALL reimburse such payor(s) in full.

---

[77] A copy is available in the record on appeal from No. COA 17-404; see ROA p. 63 for this finding.
[78] No. COA 17-404, ROA p. 65, conclusion of law number 7.
[79] Id. at ROA p. 66.

80. The Deputy Commissioner, accordingly, found that UPS and Liberty Mutual were liable for the claim, including for all of the medical costs and expenses related to Mr. Penegar's mesothelioma, and including the explicit directive to pay back Medicare.[80]

81. UPS and Liberty Mutual appealed. The award was affirmed by the Full Commission on December 8, 2016.[81] This award was consistent with the O&A dated April 15, 2016, including findings that the medical treatment the decedent received for his mesothelioma was reasonably necessary and that Medicare had a conditional payment lien, a conclusion of law that "Defendants shall pay for all the medical treatment decedent received for his compensable mesothelioma," and an award that "defendants shall pay medical compensation for all medical treatment incurred by decedent for his compensable occupational disease of mesothelioma."[82]

82. The Defendants appealed that ruling to the North Carolina Court of Appeals, which affirmed by a unanimous decision on May 1, 2018.[83] The Court of Appeals *inter alia* plainly noted that the NCIC award included medical expenses in its scope, describing "the opinion and award of the Full North Carolina Industrial Commission, which awarded Plaintiff compensation for all of Decedent's medical expenses associated with his diagnosis of mesothelioma, total disability compensation, burial expenses, and death benefits."[84]

83. The Court of Appeals opinion was issued on May 1, 2018. On information and belief, on May 18, 2018, only 17 days later, Liberty Mutual reported to CMS that their Ongoing

---

[80] Opinion and Award by Robert J. Harris, Deputy Commissioner, NCIC, filed April 15, 2016, I.C. File Nos. 14-769356 & 15-742389.

[81] Opinion and Award for the Full Commission by Christopher C. Loutit, Commissioner, NCIC, filed Dec. 8, 2016, I.C. File Nos. 14-769356 & 15-742389.

[82] Opinion and Award for the Full Commission, copy available at No. COA 17-404, ROA pp. 199 (findings of fact nos. 63 & 64), 202 (conclusion of law no. 9, award para. No. 1).

[83] *Penegar v. United Parcel Serv.*, No. COA17-404, 259 N.C. App. 308, 815 S.E.2d 391 (May 1, 2018), *disc. rev. denied*, 373 N.C. 57, 832 S.E.2d 715 (Sept. 25, 2019).

[84] 259 N.C. App. at 309.

26

Responsibility for Medicals ("ORM") was terminated. ORM is a Medicare term referring to the RRE's (Responsible Reporting Entity's) ongoing responsibility to pay for the injured party's/Medicare beneficiary's medicals associated with the claim.

84. On information and belief, the issuance of the May 18, 2018 letter was related to the May 1, 2018 Court of Appeals Opinion, and, its content was misleading in that it failed acknowledge that in fact Defendants did have an ongoing responsibility to pay Medicare whether now or after exhaustion of further efforts to appeal or reduce the matter to a settlement. At that point, Mr. Penegar had died over three years ago on March 26, 2015, yet Defendants had failed to pay back Medicare and were in effect benefiting from an continuing interest-free loan or float of the funds Medicare had paid and they had not reimbursed.

85. On June 12, 2018, CMS wrote another letter, addressed both to claimant's counsel Mr. Pross, and, to Liberty Mutual c/o PMSI. Among other things, it reiterated:

Beneficiary Name:     PENEGAR JR, JOHN R
Medicare ID:     239505591A
Case Identification Number:     20150 15090 00263
Date of Incident:     January 30, 1998

Subject: Insurer Conditional Payment Letter

Dear LIBERTY MUTUAL:

Medicare has identified a claim or number of claims for which you have primary payment responsibility and Medicare has made primary payment. Medicare must recover these payments from the entity responsible for payment or, when payment has been made, from the entity/individual who has received payment for these claims (see 42 U.S.C. 1395y(b)(2)).

86. On July 13, 2018, CMS issued another letter to Liberty Mutual, copying both PMSI and Verisk subsidiary ISO Claims Partners. It reflected total conditional payments of $46,452.23. It recited that the BCRC had received a request for claims to be removed or added, i.e., a

27

"Conditional Payment Claim Dispute," and described that after review, BCRC partially agreed with the dispute and adjusted the case accordingly.

87.     On April 23, 2019, CMS wrote that the total charges came to $144,857.33 and the total CP aka conditional payments came to $46,562.23.  It enclosed a listing itemizing the Medicare Part A and Part B claims and directed the recipient to MSPRP to submit other information.

88.     As to the Court of Appeals order, Defendants filed a petition for discretionary review with the North Carolina Supreme Court.  It was denied on September 25, 2019.[85]

89.     On October 4, 2019, only nine days later, Defendant Verisk acting on behalf of Liberty Mutual wrote to CMS (directed to the CRC and BCRC entities who assist CMS).  A representative identifying as being with ISO Claims Partners, on a document with Verisk letterhead, wrote a letter captioned as a "NOTICE OF ORM TERMINATION – REQUEST FOR CASE CLOSURE OR FINAL DEMAND."  The full body text was as follows:

Please be aware that ORM terminated for this claim on 03/26/2015 when the beneficiary passed away.  This was reported to Medicare electronically through Sec 111 on 05/18/2018 and should be available in the CWF.  There will be no settlement or TPOC.  Given this, please process a Final Lien Demand or Case Closed Letter and provide us with a copy of the letter.  If you have any questions, please do not hesitate to contact ISO Claims Partners at 866-630-2772.

Thank you,

*Lauren Brooks*

Lauren Brooks
ISO Claims Partners

90.     The letter states "ORM terminated for this claim."  Then, it states that "[t]here will be no settlement or TPOC."  As noted above, ORM means Ongoing Responsibility for Medicals, while TPOC means Total Payment Obligation to Claimant.  The ORM and TPOC categories are

---

[85] *Penegar v. United Parcel Serv.*, No. COA17-404, 259 N.C. App. 308, 815 S.E.2d 391 (May 1, 2018), *disc. rev. denied*, 373 N.C. 57, 832 S.E.2d 715 (Sept. 25, 2019), No. 204P18.

the two basic ways in which primary payers reimburse Medicare. By claiming that its ORM responsibility had ended and that there would be no TPOC responsibility, and inviting a case closed letter, Defendants were misrepresenting that it had no responsibility to reimburse Medicare nor would it have one going forward. That was false -- Defendants had just received a court order ending any chance they had no further appealing the Deputy Commissioner award, which said that they "SHALL" pay for medical expenses and "SHALL" reimburse Medicare.

91.     When its petition for discretionary review was denied, Liberty Mutual had to obey this directive to pay. To do so, it agreed to a settlement which was approved by the NCIC. It was clearly false to state "there will be no settlement" as a settlement was exactly what then occurred. And it was false to state there would be no TPOC as there was no way to avoid the TPOC duty under the orders, which were now the final "settlement, judgment, award or other payment."[86]

92.     Relying on the representations made by Defendants' October 4, 2019 letter that Liberty Mutual had no duty to pay, CMS issued a case closed letter dated November 14, 2019:

Beneficiary Name:          PENEGAR JR, JOHN R
Medicare ID:               *****5591A
Case Identification Number: 20150 15090 00263
Date of Incident:          January 30, 1998

Subject: Medicare Case is Closed

Dear LIBERTY MUTUAL:

We are in receipt of your letter advising that your responsibility for medical payments related to the incident referenced above has been terminated. Our records have been updated accordingly and our case for the Medical Payments Coverage, Personal Injury Protection, or no-fault issue has been closed. If you have not already done so, please update any records you submitted as a part of Medicare, Medicaid, and SCHIP Extension Act (MMSEA) Section 111 Mandatory Insurer Reporting.

---

[86] Section 111 NGHP User Guide, pp. 3-2, 6-1, 6-22.

93.     The above-excerpted letter reflected that CMS had relied on Defendants' incorrect representations. Defendants had a duty to immediately respond and correct CMS and confirm that far from having their "responsibility terminated," they remained fully liable.

94.     The date of Liberty Mutual's settlement agreement in IC No. 14-769356 (the claim filed while he was alive) was May 1, 2020. It included a recitation that "The Defendants allege that a $0.00 Medicare lien exists as of the signing of this agreement." In fact, as alleged above, Defendants did owe and continue to owe reimbursement to Medicare. Further, Defendants cannot contract out of this statutory responsibility. The date of the settlement in IC No. 15-742389 (the claim filed after Mr. Penegar's death) was also May 1, 2020 and included a similar recitation.

95.     The settlement agreements were sent to the NCIC. On June 3, 2020, the NCIC issued an order approving the settlement in IC No. 14-769356. On June 5, 2020, the NCIC issued an order approving the settlement in IC No. 15-742389.

96.     Due to the limited benefits available under workers' compensation law and certain determinations made by the NCIC, Penegar's total award for workers' compensation was modest, resulting in a settlement payment of $1000 for the life claim, and $17,500 for the death claim.

97.     Then, on October 5, 2020, CMS sent a new letter to Ms. Penegar, reciting that Medicare was now aware that "you have received a settlement" and "that you are required to repay the Medicare program $18,500,00 for the cost of medical care it paid relating to your case." The $18,500 figure reflects the full amount of the settlement Mrs. Penegar received. If Defendants had not violated their primary payer duties, this demand would not have occurred.

98.     As noted previously, Defendants had 135 calendar days to report the settlement to CMS.[87] The trigger date for the 135-day period at the latest fell on the date of the orders approving

---

[87] Section 111 User Guide, p. 6-62 (135 calendar days).

the settlements, June 3 and 5, 2020. From June 3, 2020, adding 135 days takes one to Friday, October 16, 2020. From June 5, 2020, adding 135 days takes one to Sunday, October 18, 2020.[88] This action is ripe and filed at the proper time.

**N.**     **Additional allegations regarding Liberty Mutual and Verisk.**

99.     Liberty Mutual is one of the top ten workers' compensation insurers in the United States. As with other large insurance companies, it uses uniform systems and practices with regard to claims handling and payment mechanisms. The same uniform systems and practices that have led to Liberty Mutual's failure to reimburse CMS for Mr. Penegar have also caused similar violations regarding other claimants.

100.    Liberty Mutual Holding Company Inc. and its subsidiaries reported consolidated net income from continuing operations of $1.095 billion for the twelve months ended December 31, 2019 and $1.633 billion for the same period in 2018. Liberty Mutual has far greater sophistication and resources for purposes of ensuring Medicare compliance and meeting CMS duties than do ordinary individuals, the Plaintiff here, or the putative class members.

101.    Verisk markets itself as a sophisticated information provider and vendor to the insurance and healthcare industries. It touts itself as offering expertise in analytics and decision-support in the insurance sector. Verisk touts that its services allow its customers to make better risk decisions with greater efficiency and discipline.

102.    For the year ended December 31, 2019, Verisk had revenues of $2,607.1 million and net income of $449.9 million. Verisk has far greater sophistication and resources for purposes

---

[88] Section 111 User Guide, p. 6-2. Required Reporting Entities must comply with CMS Section 111 reporting on a quarterly basis, i.e., each 90 days. RREs using the Medicare reporting portal (aka the "DDE," direct data entry or dynamic data exchange) are required to report within 45 days of a TPOC. Adding the 90- plus 45-day periods together yields 135 days.

of ensuring Medicare compliance and meeting CMS duties than do ordinary individuals, the Plaintiff here, or the putative class members.

103.    On information and belief, Verisk was directly and materially involved in assisting Liberty Mutual with the acts and omissions that led to the failure to reimburse Medicare according to applicable laws and regulations with regard to Mr. Penegar and the putative class, and as a result, all Defendants are jointly and severally liable.

104.    The time period for Defendants to timely satisfy their obligation to CMS and Medicare has expired. All conditions precedent and applicable statutes of limitations or repose are met for purposes of bringing the claims for relief alleged below.

## V.    CLASS ALLEGATIONS.

105.    Pursuant to Fed. R. Civ. P. 23(c)(1)(B) and 23(g)(1), Plaintiff requests the Court adopt the following class definition:

North Carolina class:  All individuals who are a) a Medicare beneficiary who received an item or service; b) for whom Medicare made a payment to their medical providers; c) where Liberty Mutual was the carrier for their primary plan, or, Verisk was directly involved in its management; d) where Defendants have a demonstrated responsibility for the payment as reflected by a North Carolina workers' compensation judgment, settlement, settlement, award, or contractual obligation; e) where the date of filing of this complaint[89] falls not later than three years after the date of the receipt of notice by the government of a settlement, judgment, or award, if notice was given; and f) where Defendants have failed within 135 days or otherwise to timely make reimbursement required by Medicare or otherwise act in a timely manner so as to avoid being in violation of the MSP statute.

National class:  All individuals who are a) a Medicare beneficiary who received an item or service; b) for whom Medicare made a payment to their medical providers; c) where Liberty Mutual was the carrier for their primary plan, or, Verisk was directly involved in its management; d) where Defendants have a demonstrated responsibility for the payment as reflected by a workers' compensation judgment, settlement, settlement, award, or contractual obligation; e) where the date of filing of this complaint falls not later than three years after the date of the receipt of notice by the government of a settlement, judgment, or award, if notice was given; and f)

---

[89] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) (filing of a class action tolls the applicable statute of limitations for all persons encompassed by the putative class pending decision on certification).

where Defendants have failed within 135 days or otherwise to timely make reimbursement required by Medicare or otherwise act in a timely manner so as to avoid being in violation of the MSP statute.

106.    Under Fed. R. Civ. P. 23(a)(1), the class is so numerous that joinder of all members is impracticable. Liberty Mutual is one of the largest workers' compensation carriers in the United States; Verisk is one of the largest plan managers; both use common systems for purposes of processing claims, making payments and communicating with Medicare.  On information and belief, numerous individuals similarly situated as Penegar have been subjected to similar failures by Liberty Mutual to reimburse Medicare.

107.    Under Rule 23(a)(2), there are common questions of law or fact, which include:

a)     Whether Defendants have used uniform policies and systems for purposes of managing claims and reporting to CMS;

b)     Whether those uniform policies and systems have been inadequate to carry out their MSP statutory duties and ensure prompt and accurate reimbursement;

c)     Whether Liberty Mutual has failed to meet its primary payer obligations to Medicare in connection with workers' compensation claims, awards, orders and settlements pertaining to the Plaintiff and to class members;

d)     Whether Verisk has directly and actively participated in managing workers' compensation plans and primary payer reporting to CMS so as to render Verisk jointly and severally liable under the private cause of action;

e)     Whether the Plaintiff and the class members are entitled to an award under the Medicare private cause of action statute;

f)     Whether the Plaintiff and class members are entitled to an award of double damages with subrogation to Medicare for appropriate amounts; and/ot

g)     Whether the Plaintiff and class members are entitled to certification of an issue class under Rule 23(c)(4) with regard to one or more of the substantive issues presented by their private cause of action.

108.    The claims of the representative party herein are typical of the claims of the class under Rule 23(a)(3).

33

109. Under Rule 23(a)(4), the representative Plaintiff will fairly and adequately protect the interests of the class. Counsel are competent and experienced in workers' compensation and complex and class action litigation.

110. Pursuant to Rule 23(b)(1), a class action may be maintained because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individuals that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair their ability to protect their interests.

111. Pursuant to Rule 23(b)(3), a class action may be maintained because questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for adjudicating the controversy.

112. Each of the factors under Rule 23(b)(3) is met. The class members have an interest in common prosecution and resolution via the class action mechanism, because of the complexity of the Medicare and CMS secondary payer system and the expense required to engage in discovery of Defendants' internal systems and interactions. There is no currently ongoing litigation of which Plaintiff is aware that would subsume the relief sought. It is efficient to concentrate the litigation in one forum, given the already-overburdened Medicare system and the inefficiency of seeking piecemeal relief in separate actions. The class action may be managed by use of practical and equitable discovery and scheduling mechanisms.

113. Pursuant to Rule 23(c)(1)(A) & (B), Plaintiff requests that the Court certify a class defined as noted above. Data sufficient to identify all class members should be accessible in Defendants' own business records, Medicare data available by subpoena or other mechanism, and

information available from the NCIC or otherwise.  Plaintiff requests that the Court certify the above-defined class for purposes of their first claim for relief alleged hereinbelow.

114.    In the alternative, Plaintiff alleges that the Court should under Fed. R. Civ. P. 23(c)(4) certify a class with respect to one or more particular issues on the merits, as even that partial classwide relief would make more efficient and tenable the efforts by stakeholders to ensure full Medicare reimbursement and solvency of the Medicare program.

**COUNT I**
**Medicare Private Right of Action, 42 U.S.C. § 1395y(b)(3)(A)**

115.    Plaintiff reasserts and realleges the contents of paragraphs 1 through 114 as if repeated fully herein.

116.    Defendants are each a "primary payer" for purposes of the MSP statute, 42 U.S.C. § 1395y(b), by virtue of their direct active involvement in management of one or more relevant workers' compensation plans which have primary payer duties under the statute.

117.    The workers' compensation insurance coverages for Plaintiff or her decedent and class members are "primary plans"[90] for purposes of the MSP statute.

118.    Defendants have a demonstrated responsibility[91] to reimburse Medicare for payments made for medical items and services related to Mr. Penegar's mesothelioma, and with regard to relevant medical care for similarly situated class members.

119.    Defendants have the responsibility of covering costs of medical items and services under the workers' compensation system for Plaintiff and class members. By instead shifting these medical costs to Medicare, Defendants have directly and proximately caused actual harm and damage and legally cognizable injury under 42 U.S.C. § 1395y(b)(3)(A) and Plaintiff has standing

---

[90] *See* 42 U.S.C. § 1395y(b)(2)(A).
[91] *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

to sue. Furthermore, on information and belief, as a direct and proximate result of Defendants' improper conduct, Plaintiff and class members have incurred co-pays, deductibles, and other out-of-pocket exposures, have had the quality of their medical care compromised, and have had the financial viability of the Medicare program compromised, in derogation of their right to full medical coverage under both the workers' compensation system and the Medical program. In addition, on information and belief, Defendants' failures to meet their Medicare reimbursement duties have caused Plaintiff's decedent's and class members' medical providers to accept lesser payments through the Medicare system than the amounts they would have been paid if promptly paid by Defendants directly.

120. Defendants' failures to meet their Medicare reimbursement duties have caused the federal government, and specifically Medicare, to absorb and subsidize the cost of the decedent's medical needs and those of class members, for which Defendants, under the workers' compensation system and Medicare, have primary and full responsibility. As a direct and proximate result of Defendants' violations of the MSP statute, under 42 U.S.C. § 1395y(b)(3)(A), Plaintiff is entitled to an award of double damages as a result of Defendants' violations of their statutory duties as to the medical expenses for Mr. Penegar; entitled to certification of a class either with regard to this cause of action as a whole or as to one or more of its relevant issues; and entitled to an award of classwide relief with regard to class members under parameters to be determined as this matter proceeds.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury of all issues or claims so triable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that the Court grant relief including:

1.      A finding of liability of Defendants on the individual claim alleged by the Plaintiff;

2.      An award of double damages under 42 U.S.C. § 1395(b)(3)(A) and/or any other damages as may be recoverable awardable individually to the Plaintiff;

3.      Designation of the named Plaintiff as Class Representative under Rule 23(c) and of counsel listed below as Class Counsel under Rule 23(g);

4.      Certification of a class as to the cause of action alleged herein under Rule 23(c), or, with regard to one or more particular issues under Rule 23(c)(4), and entry of an order allowing dissemination of class notice under Rule 23(c)(2);

5.      A finding of liability of Defendants with regard to the putative class, on the merits;

6.      An award of double damages under 42 U.S.C. § 1395(b)(3)(A) and/or any other damages as may be recoverable under the cause of action alleged herein, as may me awardable on a class basis;

7.      An award of any applicable statutory and common law pre-judgment and post-judgment interest, and attorneys' fees if allowable by law;

8.      for any additional and other relief that the Court deems appropriate.

Respectfully submitted, this the 23rd day of October, 2020.

s/Vernon Sumwalt
N.C. State Bar #25700
Attorney for Plaintiff
The Sumwalt Group
Post Office Box 31424
Charlotte, North Carolina 28231-1424
Phone: (704) 565-0621
Fax: (704) 599-1783
Email: vernon@sumwaltgrp.com

s/John Hughes
William Graham, N.C. State Bar #17972
Mona Lisa Wallace, N.C. State Bar #9021
Ed Pauley, N.C. State Bar #27060
John Hughes, N.C. State Bar #22126
Wallace & Graham, PA
525 N. Main Street
Salisbury, North Carolina 28144
Phone: (704) 633-5244
Email: bgraham@wallacegraham.com
mwallace@wallacegraham.com
epauley@wallacegraham.com
jhughes@wallacegraham.com

*Counsel for Plaintiffs*